**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| K.B., an individual;<br><br>                    Plaintiff<br><br>        -against-<br><br>INTER-CONTINENTAL HOTELS CORPORATION; WYNDHAM HOTELS AND RESORTS, INC.; BEST WESTERN INTERNATIONAL, INC.; AND MARRIOTT INTERNATIONAL, INC.;<br><br>                    Defendants. | CIVIL ACTION NO :1:19-CV-01213<br><br>**PLAINTIFF'S COMPLAINT FOR DAMAGES**<br><br><u>**JURY TRIAL DEMANDED**</u> |

## <u>COMPLAINT</u>

COMES NOW the Plaintiff K.B., by and through her undersigned counsel, and respectfully submits her complaint for damages against Defendants, and makes the following averments.

## <u>INTRODUCTION</u>

1.    For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country.  Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2.    Inter-Continental Hotels Corporation, Wyndham Hotels and Resorts, Inc., Best Western International, Inc., and Marriott International, Inc. know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country.  Rather than taking timely and effective measures to thwart this epidemic, the Defendants have chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose instead.

3.    This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter

identified by her initials K.B., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.   K.B. was first trafficked for commercial sex at the age of 26 years old in New Hampshire. Her first trafficker was a boyfriend who manipulated K.B into falling for him. K.B. had been legally declared a vulnerable adult in the state of New Hampshire and her trafficker knew that she had been sexually abused as a child.  He used her apparent vulnerability and his knowledge of her normal desire for a loving relationship against her. Eventually, K.B. was forced by her trafficker to sexually service paying strangers. Preying on her need for affection of any sort, K.B.'s trafficker made sure that she actually believed that they were in a romantic relationship as he pushed her into commercial sex.  K.B.'s trafficker would placate her by buying her clothing, complimenting her, and giving her small gifts as he apologized for his physical abuses and torture.  K.B.'s trafficker threatened her that if she rebelled against his demands, he would take away the love that they had.  Later, K.B.'s trafficker would give her to other traffickers who bought, sold, and required her to sexually service paying strangers as she endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels as the Defendants did nothing but profit from her exploitation.

5.   The Plaintiff now brings this action for damages against the Defendants listed herein.  Each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

6.   K.B. was advertised on Backpage.com against her will, physically tortured, and sexually exploited under such duress at hotels in Concord, Keene, and Gilford, New Hampshire including the Holiday Inn® Concord Downtown located at 172 North Main Street in Concord, the Best Western® Concord Inn & Suites located at 97 Hall Street in Concord, the Best Western Plus® Keene Hotel located at 401 Winchester Street in Keene, the Super 8® by Wyndham - Tilton/Lake Winnipesaukee located at 7 Tilton Road in Tilton and the TownePlace Suites® by Marriott - Laconia-Gilford located at 14 Sawmill Road in Gilford, New Hampshire.

7.    As a direct and proximate result of the Defendants' consistent refusals to prevent human trafficking at their hotels, K.B. was sexually exploited, trafficked, and repeatedly victimized at the Defendants' hotels.

8.    The Plaintiff brings this action pursuant to the TVPRA and 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, and financially benefited from a venture in which K.B. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

## PARTIES

9.    The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials K.B., was a 26 year old vulnerable adult when she was first sold for sex and trafficked throughout New Hampshire.  The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).   The Plaintiff now resides in Vermont.

10.    Defendant Inter-Continental Hotels Corporation ("IHG") is one of the largest hotel brands in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its regional headquarters in Atlanta, Georgia and can be served by its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

  a.    Holiday Inn® brand hotels are IHG hotels.

  b.    As a hotel operator, Defendant IHG controls the training and policies for its branded properties including the Holiday Inn® where K.B. was trafficked.  Defendant IHG represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with IHG brand standards and all local, state, and federal laws.[2]

---

[1] Contemporaneously with the Complaint, Plaintiff K.B. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for the Defendants upon proper effectuation of service.

[2] Inter-Continental Hotels Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227

   c.   By and through its relationship with the staff at the Holiday Inn® where K.B. was

         trafficked, and the hotel guest perpetrator who trafficked K.B. at a Holiday Inn® hotel,

         Defendant IHG knowingly benefited, or received something of value from its

         facilitation of, or participation in, a venture which it knew or should have known to

         engage in sex trafficking.

   d.   IHG receives a percentage of the gross room revenue from the money generated by the

         operations of Holiday Inn® including a percentage of the revenue generated for the rate

         charged on the hotel guest rooms in which the Plaintiff was sex trafficked.

   e.   IHG owns, supervises, and/or operates the Holiday Inn® Concord Downtown located at

         172 North Main Street in Concord, New Hampshire.

   f.   IHG is subject to the jurisdiction of this Court because it regularly transacts business in

         New Hampshire, operates dozens of hotels in New Hampshire, contracts to supply

         services in New Hampshire, caused indivisible injuries to the Plaintiff in New

         Hampshire, and knowingly profited from an illegal sex trafficking venture at the

         Holiday Inn® Concord Downtown located at 172 North Main Street in Concord, New

         Hampshire.

11.   Defendant Best Western International, Inc. (hereinafter "Best Western") is one of the largest

hotel companies in the world offering public lodging services directly or through its affiliates,

subsidiaries, and franchisees.  Best Western International, Inc. is an Arizona corporation with its

corporate headquarters in Phoenix, Arizona and may be served with service of process by serving its

registered agent Corporation Service Company, Inc. at 10 Ferry Street S313, Concord, NH, 03301.

   a.   Best Western® brand hotels are Best Western hotels.

   b.   As a hotel operator, Defendant Best Western controls the training and policies for its

         hotels including the Best Western® hotels where K.B. was trafficked.  Defendant Best

_____

(last visited Nov. 22, 2019)

Western represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Best Western brand standards and all local, state, and federal laws.[3]

c.   By and through its relationship with the staff at the Best Western® where K.B. was trafficked, and the hotel guest perpetrator who trafficked K.B. at Best Western® hotels, Defendant Best Western knowingly benefited, or received something of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

d.   Best Western receives a percentage of the gross room revenue from the money generated by the operations of all Best Western® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

a.   Best Western owns, supervises, and/or operates the Best Western® Concord Inn & Suites located at 97 Hall Street in Concord and the Best Western Plus® Keene Hotel located at 401 Winchester Street in Keene, New Hampshire.

e.   Best Western is subject to the jurisdiction of this Court because it regularly transacts business in New Hampshire, operates dozens of hotels in New Hampshire, contracts to supply services in New Hampshire, caused indivisible injuries to the Plaintiff in New Hampshire, and profited from an illegal sex trafficking venture at the Best Western® Concord Inn & Suites located at 97 Hall Street in Concord, New Hampshire and the Best Western® Plus Keene Hotel located at 401 Winchester Street in Keene, New Hampshire.

12.   Defendant Wyndham Hotels and Resorts, Inc. (hereinafter "Wyndham") is another of the world's largest hotel companies and offers public lodging services directly or through its affiliates,

---

[3] Best Western International Human Rights Policy, https://www.bestwestern.com/en_US/about/press-media/best-western-human-rights-policy.html (last visited Nov. 20, 2019).

subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Parsippany, New

Jersey and can be served by its registered agent Corporate Creations Network Inc., 3411 Silverside Road,

Suite 104, Wilmington, Delaware.

a.  Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham

Worldwide Corporation and retains successor liability for the wrongful acts of the

predecessor.

b.  Super 8® brand hotels are Wyndham hotels.

c.  As a hotel operator, Defendant Wyndham controls the training and policies for its hotels

including the Super 8® hotel where K.B. was trafficked.

d.  Defendant Wyndham maintains that it considers guest safety and security to be

important and requires the hotels in its portfolio to comply with Wyndham brand

standards and all local, state, and federal laws.[4]

e.  By and through its relationship with the staff at the Super 8® hotel where K.B. was

trafficked and the hotel guest perpetrator who trafficked her at a Super 8® hotel,

Defendant Wyndham knowingly benefited, or received something of value, from its

facilitation of, or participation in, a venture which it knew or should have known to

engage in sex trafficking.

f.  Wyndham receives a percentage of the gross room revenue from the money generated

by the operations of all Super 8® hotels, including a percentage of the revenue generated

from the rate charged for the rooms in which the Plaintiff was sex trafficked.

g.  Wyndham owns, supervises, and/or operates the Super 8® Tilton/Lake Winnipesaukee

located at 7 Tilton Road in Tilton, New Hampshire.

h.  Wyndham is subject to the jurisdiction of this Court because it regularly transacts

---

[4] Wyndham Hotels and Resorts, 2019 Social Responsibility Report: Protecting Our Human Rights (p.30) available at
https://corporate.wyndhamhotels.com/wp-content/uploads/2019/07/Wyndham-GRI-2019-Final_web.pdf (last visited Nov. 20,
2019).

business in New Hampshire, operates dozens of in New Hampshire, contracts to supply

services in New Hampshire, caused indivisible injuries to the Plaintiff in New

Hampshire, and profited from an illegal sex trafficking venture at the Super 8®

Tilton/Lake Winnipesaukee located at 7 Tilton Road in Tilton, New Hampshire.

13.   Defendant Marriott International, Inc. (hereinafter "Marriott") is another of the largest hotel

companies in the world offering public lodging services directly or through its affiliates, subsidiaries,

and franchisees.  It is a Delaware corporation headquartered in Bethesda, Maryland and can be served

by its registered agent CT Corporation System, 2 1/2 Beacon Street, Concord, NH, 03301 – 4447.

   a.   TownePlace Suites® brand hotels are Marriott hotels.

   b.   As a hotel operator, Defendant Marriott controls the training and policies for its hotels

       including the TownePlace Suites® hotel where K.B. was trafficked.  Defendant Marriott

       represents that it considers guest safety and security important and requires the hotels in

       its portfolio to comply with Marriott brand standards and all local, state, and federal

       laws.[5]

   c.   By and through its relationship with the staff at the TownePlace Suites® where K.B.

       was trafficked, and the hotel guest perpetrator who trafficked K.B. at the TownePlace

       Suites®, Defendant Marriott knowingly benefited, or received something of value, from

       its facilitation of or participation in a venture which it knew or should have known to

       engage in sex trafficking.

   d.   Marriott receives a percentage of the gross room revenue from the money generated by

       the operations of all TownePlace Suites® hotels, including a percentage of the revenue

       generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

   e.   Marriott owns, supervises, and/or operates the TownePlace Suites® Laconia-Gilford

       located at 14 Sawmill Road in Gilford, New Hampshire.

---

[5] Marriott International Inc., Human Rights Policy Statement (July 2017) available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

    f.    Marriott is subject to the jurisdiction of this Court because it regularly transacts business in New Hampshire, operates dozens of hotels in New Hampshire including the TownePlace Suites®, contracts to supply services in New Hampshire, caused indivisible injuries to the Plaintiff in New Hampshire, and profited from an illegal sex trafficking venture at the TownePlace Suites® Laconia-Gilford located at 14 Sawmill Road in Gilford, New Hampshire.

14.    Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

15.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.)

16.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

17.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

18.    To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The

crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

19.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

20.    Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[6]

## FACTUAL ALLEGATIONS

### A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project [7]*

21.    Human trafficking is the world's fastest growing crime.[8]  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year

---

[6] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.
[7] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[8] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[9]

22.     Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

23.     The hospitality industry plays a crucial role in the sex trade.[10]   The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

24.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[11]  Traffickers and buyers alike frequently use hotel rooms to exploit victims.

25.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.

26.     Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[12]

27.     The problem is industry wide.  In the United States, as much as 63% of all trafficking incidents

---

[9] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[11] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[12] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

happen in hotels ranging from luxury to economy.[13]

28.     Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[14]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, failure to train staff on what to look for and how to respond, and/or failure to establish safe and secure reporting mechanisms for those at the point of sale.

29.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

30.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[15]

31.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs.[16]

32.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security

---

[13] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[14] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).
[15] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[16] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

measures, hospitality companies could prevent regular sex trafficking under their flag.

33.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[17]

34.      Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[18] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

35.     Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[19]

36.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

37.     In 2011, Wyndham Hotels trained only some of its employees to look for signs of trafficking.[20]

38.     Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and

---

[17] Id. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[18] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[19] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[20] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

provides associate training on human trafficking awareness and prevention." [21]

39.     In 2013, IHG commissioned an external assessment of human rights risks most relevant for the travel and hospitality sector globally and regionally working with external human rights experts, Maplecroft. The risks identified included human trafficking.[22]

40.     In 2015 and 2016 IHG identified the modern slavery risks most relevant to IHG across four different areas of risk: (I) risks of modern slavery affecting their organization including IHG hotels, (ii) risks of modern slavery occurring in IHG corporate or hotel supply chains, (iii) risks of modern slavery such as human trafficking occurring in or around IHG branded hotels, (iv) risks of modern slavery occurring at different stages of the hotel lifecycle.  IHG represents that its various risk assessment mechanisms have helped them to identify higher risk locations since 2013.

41.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[23]   These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[24]

42.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

---

[21] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at
https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).
[22] Inter-Continental Hotel Group, Modern Slavery Statement 2017 available at https://www.ihgplc.com/-
/media/ihg/Files/pdf/modern-slavery-statement-2017-ihg-010318.ashx?la=en&hash=B688F42E878C145EC5C8C9DF02ABC227 (last visited Nov. 22, 2019).
[23] DHS Blue Campaign Five Year Milestone, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[24] Human Trafficking and the Hospitality Industry, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

### B.    THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

43.    Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

44.    The average consumer does not see this relationship.  The parent brand gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

45.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  Thus, booking and room reservations are controlled by the corporate parent brand.[25]

46.    The local hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

47.    Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

48.    At the time of the incidents alleged herein:

   a.    Defendant IHG owned and controlled the Holiday Inn® brand.

   b.    Defendant Best Western owned and controlled the Best Western® brand.
   c.     Defendant Wyndham owned and controlled the Super 8® brand.

---

[25] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

    d.   Defendant Marriott owned and controlled the TownePlace® Suites brand.

49.    Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments so it is seldom done.

### C.  THE DEFENDANTS' WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

50.    Defendants IHG, Best Western, Wyndham, and Marriott have been on notice of repeated incidences of sex trafficking occurring across their Holiday Inn®, Best Western®, Super 8®, and TownePlace Suites® hotels yet have failed, and continue to fail, to take the necessary action to prevent sex trafficking throughout their hotels.

51.    INTER-CONTINENTAL HOTELS CORPORATION ("IHG"):

    a.   HOLIDAY INN®

        i.   Defendant IHG owns, supervises, or operates the Holiday Inn® Concord Downtown located at 172 North Main Street in Concord, New Hampshire.

        ii.   IHG failed to implement and enforce any of its own policy or policies and protect Plaintiff K.B. from being sex trafficked.

        iii.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant IHG has repeatedly failed to stop these actions.

        iv.   Defendant IHG could have exercised control over Holiday Inn® hotels by:

            1.   distributing information to assist employees in identifying human trafficking;

            2.   providing a process for escalating human trafficking concerns within the organization;

            3.   requiring employees to attend training related to human trafficking;

            4.   providing new hire orientation on human rights and corporate responsibility;

            5.   providing training and education to Holiday Inn® branded hotels through

webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking; or

7. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

ii. IHG was in an agency relationship with Holiday Inn® hotels offering public lodging services. This agency relationship was created through Defendant IHG's exercise of an ongoing and systemic right of control over Holiday Inn® hotels by Defendant IHG's operations, including the means and methods of how Holiday Inn® hotels conducted daily business through one or more of the following actions:

1. hosting online bookings on Defendant IHG's domain;

2. requiring Holiday Inn® branded hotels to use Defendant IHG's customer rewards program;

3. setting employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by the owner;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by owner;

11. fixing prices; or

12. other actions that deprive Holiday Inn® hotels of independence in business operations.

iii.   An apparent agency also exists between Defendant IHG and Holiday Inn® hotels. Defendant IHG held out Holiday Inn® hotels to the public as possessing authority to act on its behalf.

iv.   Given Defendant IHG's public statements on behalf of its hotels and the control it assumed in educating, implementing, and directing its hotels, including Holiday Inn® hotels, Defendant IHG breached its duties in the following ways:

1. did not adequately distribute information to assist employees in identifying human trafficking;

2. failed to provide a process for escalating human trafficking concerns within the organization;

3. failed to mandate managers, employees, or owners attend training related to human trafficking;

4. failed to provide new hire orientation on human rights and corporate responsibility;

5. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. failed to develop and hold or require ongoing training sessions on human trafficking; or

7. failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

v.   For years, Defendant IHG has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Holiday Inn® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Holiday Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff K.B. at Holiday Inn® hotels that forms the basis of

17

this complaint.

1. In September 2018, a bloods gang member used threats and violence to force women into prostitution. He was arrested at the Holiday Inn® in Plainview, New York.[26]

2. In October 2017, a man was arrested for trafficking minors at a Holiday Inn® in Knoxville, Tennessee. During the police sting, the authorities found a minor the man had harbored in his car that was reported missing in Asheville, North Carolina.[27]

3. In December 2017, a man forced a woman to take drugs, burned her skin and forced her to sell herself for sex. The victim met the man at a Holiday Inn® in Bethlehem, Pennsylvania for a date, but soon became his slave.[28]

4. In August 2018, three people were arrested at a Holiday Inn® in Tyler, Texas for trafficking a woman and forcing her to engage in sex with multiple johns who responded to her backpage.com advertisement.[29]

5. In October 2018, a couple trafficked a woman out of a Holiday Inn® in Minot, North Dakota. She was forced to service 3-5 clients a day, at $120-$220 a person, in order to pay for the pair's hotel rooms and methamphetamines.[30]

6. In November 2018, a man lured a missing woman into his hotel room

---

[26] *Police Say Bloods Member Arrested for Sex Trafficking*, AP NEWS (Sept. 1, 2018), https://www.apnews.com/ab1302acec7c47d49196917f7e73d6e6.

[27] *Missing NC Teen Found During Human Trafficking String Operation*, WSPA (Oct. 13, 2017), https://www.wspa.com/news/missing-nc-teen-found-during-human-trafficking-sting-operation/1009065813.

[28] Rudy Miller, *Lehigh Valley Police Uncover Nationwide Sex Trafficking Ring*, LEHIGH VALLEY LIVE (Dec. 1, 2017), https://www.lehighvalleylive.com/bethlehem/2017/12/local_police_uncover_nationwid.html.

[29] *2 Arrested, 1 More Implicated in Smith County Human Trafficking Case*, EAST ESSEX MATTERS (Aug. 28, 2018), https://www.easttexasmatters.com/news/local-news/2-arrested-1-more-implicated-in-smith-county-human-trafficking-case/1402220169.

[30] Andrea Johnson, *Andrea Beck, Richard Spain Charged With Human Trafficking*, MINOT DAILY NEWS (Oct. 11, 2018), http://www.minotdailynews.com/news/local-news/2018/10/andrea-beck-richard-spain-charged-with-human-trafficking/.

where he posted advertisements of her on classified websites to engage

in sex. Police retrieved text messages between the pimp and victim

where the victim mentioned being at the Holiday Inn® in the Bronx,

New York.[31]

52. BEST WESTERN INTERNATIONAL, INC. ("BEST WESTERN"):

    a.  BEST WESTERN®

        i.  Defendant Best Western controls, owns, supervises, or operates the Best

        Western® Concord Inn & Suites located at 97 Hall Street in Concord, New

        Hampshire and the Best Western® Plus Keene Hotel located at 401 Winchester

        Street in Keene, New Hampshire.

      ii.  Best Western failed to implement and enforce any of their own policies and

        protect Plaintiff K.B. from being trafficked.

     iii.  Founded in 1946, Best Western represents that they have more than seventy-

        three (73) years of experience in managing successful brands. From all of their

        Best Western® properties, Defendant Best Western receives an application fee,

        a lump sum payment, royalties, and other ongoing financial benefits.

     iv.  Despite having knowledge of the extensive prostitution and sex trafficking that

        occurs at hotels and specifically their hotels, Defendant Best Western has

        repeatedly failed to thwart these activities.

      v.  Defendant Best Western can exercise control over Best Western® hotels by:

          1.  distributing information to assist employees in identifying human

            trafficking;

          2.  providing a process for escalating human trafficking concerns within

---

[31]M. L. Nestel, *Alleged 'Pimp' Who Forced Women Into Prostitution, Including Missing Pennsylvania Teenager, Charged*, NEWSWEEK (Nov. 2, 2018),  https://www.newsweek.com/corinna-slusser-missing-pennsylvania-ishi-woney-fbi-nypd-new-jersey-1198253.

the organization;

3. requiring all employees to attend training related to human trafficking;

4. providing new hire orientation on human rights and corporate responsibility;

5. providing training and education to Best Western® branded hotels through webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking;

7. conducting audits of training protocols; or

8. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

vi. Defendant Best Western is in an agency relationship with its Best Western® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Best Western's exercise of an ongoing and systemic right of control over Best Western® hotels by Defendant Best Western's operations, including the means and methods of how Best Western® hotels conduct daily business including:

1. hosting online bookings on Defendant Best Western's domain;

2. requiring Best Western® hotels to use Defendant Best Western's customer rewards program;

3. setting parameters on employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8.  building and maintaining the facility in a manner specified by Best Western;

9.  standardized or strict rules of operation;

10. regular inspection of the facility and operation by Best Western;

11. fixing prices; or

12. other actions that deprive Best Western® hotels of any independence in business operations.

vii.  Apparent agency also exists between Defendant Best Western and Best Western® hotels. Defendant Best Western holds out Best Western® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

viii.  Given Defendant Best Western's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Best Western breached its duties in the following ways:

1.  did not adequately distribute information to employees on identifying human trafficking;

2.  failed to provide a process for escalating human trafficking concerns within the organization;

3.  failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

4.  failed to provide new hire orientation on human rights and corporate responsibility;

5.  failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6.  failed to develop, hold, and require ongoing training sessions on human trafficking; or

21

7. failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

vi. For years, Defendant Best Western has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Best Western® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Best Western® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff K.B. at Best Western® hotels that forms the basis of this complaint.

1. In February 2009, six (6) arrests were made for sex trafficking at a Best Western® in Clackamas, Oregon.[32]

2. In May 2011, a man was arrested and criminally charged for sex trafficking a fifteen (15) year old girl at a Best Western® in Quincy, Massachusetts.[33]

3. In December 2013, a man was arrested for trafficking women out of a Best Western® in Rockville, Maryland.[34]

4. In 2014, the city of Columbus, Ohio brought a nuisance claim for allowing drug deals and sex trafficking at a Best Western® in Columbus, Ohio[35]

5. In February 2015, a man was arrested for running a sex trafficking

---

[32] Tom Wolfe, *Girl, 17, found in Clackamas prostitution sting*, THE OREGONIAN (Feb. 23, 2009), https://www.oregonlive.com/clackamascounty/2009/02/girl_17_found_in_clackamas_pro.html
[33] John R. Ellement, *DA says girl abducted into sex slavery*, THE BOSTON GLOBE (May. 21, 2011), http://archive.boston.com/news/local/massachusetts/articles/2011/05/21/man_charged_with_abducting_teen_and_forcing_her_into_prostitution/.
[34] Pat Collins, *Inmate May have Run Prostitution Ring From Jail*, NBC WASHINGTON (Dec. 18 2013, 5:28 PM), https://www.nbcwashington.com/news/local/Inmate-May-Have-Run-Prostitution-Ring-From-Jail-236453261.html
[35] Lisa Rantala, *Columbus Hotel to Stay Open Among Nuisance Pro*, WSYX ABC 6 (Sept. 8 2014), https://www.youtube.com/watch?v=tQ0avWxGHsI

operation out of a Best Western® in Roseville, California.[36]

6.  In July 2015, a man was arrested for trafficking women out of a Best Western® in King of Prussia, Pennsylvania.[37]

7.  In December 2015, a man was arrested for trafficking a 15 year-old out of a Best Western® in South Plainfield, New Jersey.[38]

8.  In December 2016, two (2) men were arrested for sex trafficking women out of a Best Western® in Nashville, Tennessee.[39]

9.  In May 2016, thirty-three (33) individuals, including two (2) pastors were arrested on prostitution and trafficking charges for trafficking minors out of a Best Western® in Knoxville, Tennessee.[40]

10. In September 2016, a man was arrested at a Best Western® in Bensalem, Pennsylvania for trafficking four women. [41]

11. In April 2017, two (2) people were arrested for sex trafficking a minor at a Best Western® in Denton, Maryland.[42]

12. In July 2017, a man was arrested after trafficking three minors at a Best Western® in Woodlawn, Maryland.[43]

---

[36] *Roseville police make arrest in alleged human trafficking case*, GOLD COUNTRY MEDIA (Feb. 6 2015). https://www.humantrafficking.co.za/index.php/news/363-roseville-police-make-arrest-in-alleged-human-trafficking-case-6-february-2015

[37] Justin Heinze, *Norristown-Area Prostitution Sentencings Begin Tuesday*, PATCH (Jul. 28, 2015), https://patch.com/pennsylvania/norristown/norristown-area-prostitution-sentencings-are-tuesday-0

[38] Tom Haydon, *Plainfield man who recruited teen for prostitution gets 12-year sentence*, NJ.COM (Dec. 9, 2015), https://www.nj.com/union/2015/12/plainfield_man_who_recruited_girl_for_prostitution.html

[39] WZTV, *Man swallows marijuana cigarette during Nashville position sting at hotel*, FOX 17: NASHVILLE (Dec. 22, 2016), https://fox17.com/community/nashville-neighborhood-watch/man-swallows-marijuana-cigarette-during-nashville-prostitution-sting-at-hotel

[40] Ron Norman, *2 Pastors, 32 others arrested in prostitution sting*, WSPA (May 24, 2016, 6:14 AM), https://www.wspa.com/news/2-pastors-charged-with-human-trafficking-among-32-arrested-during-sting/1018484391

[41] Kara Seymour, *Pimp Who Ran Prostitution Operation From Bensalem Motel Headed to State Prison*, PATCH (Sept, 27, 2016, 12:31 PM), https://patch.com/pennsylvania/bensalem/pimp-who-ran-prostitution-operation-bensalem-motel-headed-state-prison

[42] Matt Kubisiak, *Two facing human trafficking charges for reportedly prostituting child from Denton Hotel*, WMDT (Apr. 18, 2017), https://www.wmdt.com/2017/04/two-facing-human-trafficking-charges-for-reportedly-prostituting-child-from-denton-hotel/

[43] Jessica Anderson, *Son of prominent defense attorney sentenced to 2 years in prostitution case*, THE BALTIMORE SUN (Jul 20, 2017, 2:05 PM), https://www.baltimoresun.com/news/maryland/crime/bs-md-matthew-brown-sentencing-20170720-story.html

13. In October 2017, a sixteen (16) year old girl was rescued from a Best Western® in Arlington, Virginia, where she was being sex trafficked.[44]

14. In December 2018, a husband and wife were arrested for engaging in an interstate sex trafficking scheme at a Best Western® in Portsmouth, New Hampshire.[45]

15. In March 2018, a man was investigated for recruiting high school students to participate in his sex trafficking ring. Police arrested him and at a Best Western® in Oklahoma City, Oklahoma with a woman he was selling for sexual favors.[46]

53. WYNDHAM HOTELS AND RESORTS, INC. ("WYNDHAM"):

a. SUPER 8®

i. Defendant Wyndham controls, owns, supervises, or operates the Super 8® Tilton/Lake Winnipesaukee located at 7 Tilton Road in Tilton, New Hampshire.

ii. Wyndham failed to implement and enforce any of their own policies and protect Plaintiff K.B. from being trafficked.

iii. Wyndham has more than thirty-eight (38) years of experience. From all of their Super 8® properties, Defendant Wyndham receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

iv. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Wyndham, Inc., has repeatedly failed to thwart these activities.

v. Defendant Wyndham can exercise control over Super 8® hotels by:

---

[44] Stephanie Ramirez, *2 men plead guilty to two different child sex trafficking operations*, WUSA9 (Oct. 20, 2017, 12:56 AM), https://www.wusa9.com/article/news/local/2-men-plead-guilty-to-two-different-child-sex-traffickingoperations/484712778

[45] Elizabeth Dinan, *Husband, wife charge in sex trafficking, prostitution 'scheme,'* SEACOASTONLINE, (Dec 14, 2018, 11:14 AM), https://www.seacoastonline.com/news/20181214/husband-wife-charged-in-sex-trafficking-prostitution-scheme

[46] James Coburn, *Prostitution ring targets Santa Fe students*, THE EDMOND SUN (Mar. 9, 2018), https://www.edmondsun.com/news/prostitution-ring-targets-santa-fe-students/article_e07be414-23f2-11e8-9b32-ffcbb9a0f9aa.html

1.  distributing information to assist employees in identifying human trafficking;

2.  providing a process for escalating human trafficking concerns within the organization;

3.  requiring all employees to attend training related to human trafficking;

4.  providing new hire orientation on human rights and corporate responsibility;

5.  providing training and education to Super 8® branded hotels through webinars, seminars, conferences, and online portals;

6.  developing and holding ongoing training sessions on human trafficking;

7.  conducting audits of training protocols; or

8.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

vi.  Defendant Wyndham, is in an agency relationship with Super 8® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Wyndham's exercise of an ongoing and systemic right of control over Super 8® hotels by Defendant Wyndham's operations, including the means and methods of how Super 8® hotels conduct daily business including:

1.  hosting online bookings on Defendant Wyndham's domain;

2.  requiring Super 8® hotels to use Defendant Wyndham's customer rewards program;

3.  setting parameters on employee wages;

4.  making employment decisions;

25

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by Wyndham;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by Wyndham;

11. fixing prices; or

12. other actions that deprive Super 8® hotels of any independence in their business operations.

ii. Apparent agency also exists between Defendant Wyndham and Super 8® hotels. Defendant Wyndham holds out Super 8® by Wyndham hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

iii. Given public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Wyndham breached its duties in the following ways:

1. did not adequately distribute information to employees on identifying human trafficking;

2. failed to provide a process for escalating human trafficking concerns within the organization;

3. failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

4. failed to provide new hire orientation on human rights and corporate responsibility;

5. failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

26

6.    failed to develop, hold, and require ongoing training sessions on human trafficking; or

7.    failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

vii.    For years Wyndham has failed to address the rampant culture of sex trafficking which tragically occurs throughout its Super 8® hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Super 8® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff K.B. at Super 8® hotels that forms the basis for this complaint.

1.    In August 2012, the Central Ohio Human Trafficking Task Force completed an investigation which resulted in indictments of several persons charged with human trafficking which occurred at the Super 8® on Dublin-Granville Road in Columbus, Ohio as well as other locations.[47]

2.    In September 2013, a trafficker took a 17- year old girl to a Super 8® in West Greenwich, Rhode Island and ultimately pled guilty to federal sex trafficking charges for his criminal conduct.[48]

3.    In June 2014, federal authorities charged a man with human trafficking after arresting him at a Super 8® in Wyoming, Michigan where he had taken a 15-year old girl.[49]

---

[47] John Futty, *Secret panel on human trafficking wins indictments.* THE COLUMBUS DISPATCH (Aug. 3, 2012, 8:56 AM), https://www.dispatch.com/content/stories/local/2012/08/03/secret-panel-on-human-trafficking-wins-indictments.html
[48] Michael P. McKinney, *Missouri man pleads guilty to sex trafficking for bringing 17-year-old Massachusetts girl to Rhode Island*, PROVIDENCE JOURNAL (Feb 27, 2014, 12:01 AM), https://www.providencejournal.com/breaking-news/content/20140227-missouri-man-pleads-guilty-to-sex-trafficking-for-bringing-17-year-old-massachusetts-girl-to-rhode-island.ece
[49] Barton Deiters, *Man accused of human trafficking of 15-year-old girl in Wyoming*, MLIVE (Jun. 24, 2014),

4. In July 2016, an undercover federal agent discovered 2 girls ages 18 and 15 at a Super 8® in El Paso, Texas and charged their trafficker with 2 counts of sex trafficking children by force.[50]

5. In October 2016, 2 men were arrested at a Super 8® in Frederick, Maryland and were charged with human trafficking-related offenses in relation to their crimes against a juvenile victim.[51]

6. From February 2016 through October 2017, a sex trafficking ring operated out of a Super 8® in Fort Worth, Texas and trafficked at least 5 juveniles.[52]

7. In June 2017, authorities busted a sex trafficking operation at a Super 8® in Lakeland, Tennessee, and rescued a 19-year old girl who was being held against her will and sold for sex.[53]

8. In July 2018, an investigation on the premises of a Super 8® in Columbus, Georgia led to human trafficking charges against multiple suspects.[54]

9. In August 2018, a 16-year old victim of human trafficking was rescued from a Super 8® in Duson, Louisiana.[55]

10. In September 2018, a former member of the Oklahoma state legislature was sentenced to 15 years in prison on charges of child sex trafficking

---

https://www.mlive.com/news/grand-rapids/index.ssf/2014/06/man_accused_of_human_trafficki.html

[50] Aaron Martinez, *Man pleads guilty in underage sex trafficking case*, EL PASO TIMES (Apr 21, 2017), https://www.elpasotimes.com/story/news/2017/04/21/man-pleads-guilty-sex-trafficking-case/100754896/

[51] *Two charged in Maryland with Rape, Human Trafficking, Others*, NBC WASHINGTON (Oct. 1, 2016, 7:20 AM), https://www.nbcwashington.com/news/local/Two-Charged-in-Maryland-with-Rape-Human-Trafficking-Others-395505801.html

[52] Domingo Ramirez Jr., *Statewide sex-trafficking ring operating in Fort Worth shut down with eight arrests*, FORT WORTH STAR-TELEGRAM (Oct. 17, 2017, 2:36 PM), https://www.star-telegram.com/news/local/community/fort-worth/article179323426.html

[53] *Sex trafficking operation busted at Super 8 in Lakeland*, WMC ACTION NEWS 5 (Jun 13, 2017, 9:41 PM), http://www.wmcactionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/

[54] Ben Wright, *Threesome and drugs: Escorting app leads to human trafficking charges, Columbus police say*, LEDGER-ENQUIRER (Jul. 12, 2018, 12:00 AM), https://www.ledger-enquirer.com/latest-news/article214760585.html

[55] Lester Duhe, *Authorities investigate human trafficking case involving 16 year old boy*, KLFY (Aug. 13, 2018, 6:48 PM), https://www.klfy.com/news/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/1360573674

after he was found in a room at a Super 8®, with a 17-year old boy.[56]

54. MARRIOTT INTERNATIONAL, INC. ("MARRIOTT")

    a. TOWNEPLACE SUITES®

        i. Defendant Marriott controls, owns, supervises, or operates the TownePlace Suites® Laconia-Gilford located at 14 Sawmill Road in Gilford, New Hampshire.

        iv. Marriott failed to implement and enforce any of their own policies and protect Plaintiff K.B. from being trafficked.

        v. Founded in 1927, Marriott represents that they have more than ninety-two (92) years of experience in managing successful brands. From all of their TownePlace Suites® properties, Defendant Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

        vi. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly failed to thwart these activities.

        vii. Defendant Marriott can exercise control over TownePlace Suites® hotels by:

            1. distributing information to assist employees in identifying human trafficking;

            2. providing a process for escalating human trafficking concerns within the organization;

            3. requiring all employees to attend training related to human trafficking;

            4. providing new hire orientation on human rights and corporate responsibility;

            5. providing training and education to TownePlace Suites® hotels through

---

[56] *Former Oklahoma state senator sentenced to 15 years on child sex trafficking charge*, NBC (Sept. 17, 2018, 11:24 PM), https://www.nbcnews.com/news/us-news/former-oklahoma-state-senator-sentenced-15-years-child-sex-trafficking-n910516

webinars, seminars, conferences, and online portals;

6. developing and holding ongoing training sessions on human trafficking;

7. conducting audits of training protocols; or

8. providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

viii. Defendant Marriott is in an agency relationship with its TownePlace Suites® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over TownePlace Suites® hotels by Defendant Marriott's operations, including the means and methods of how TownePlace Suites® hotels conduct daily business including:

1. hosting online bookings on Defendant Marriott's domain;

2. requiring TownePlace Suites® hotels to use Defendant Marriott's customer rewards program;

3. setting parameters on employee wages;

4. making employment decisions;

5. advertising for employment;

6. sharing profits;

7. standardized training methods for employees;

8. building and maintaining the facility in a manner specified by Marriott;

9. standardized or strict rules of operation;

10. regular inspection of the facility and operation by Marriott;

11. fixing prices; or

12. other actions that deprive TownePlace Suites® hotels of any

independence in their business operations.

ix.   Apparent agency also exists between Defendant Marriott and TownePlace Suites® by Marriott hotels. Defendant Marriott holds out TownePlace Suites® hotels to the public as their direct alter-ego each possessing authority to act on the other's behalf.

x.   Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Marriott breached its duties in the following ways:

   1.  did not adequately distribute information to employees on identifying human trafficking;

   2.  failed to provide a process for escalating human trafficking concerns within the organization;

   3.  failed to mandate all managers, employees, or owners attend training on identifying human trafficking;

   4.  failed to provide new hire orientation on human rights and corporate responsibility;

   5.  failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

   6.  failed to develop, hold, and require ongoing training sessions on human trafficking; or

   7.  failed to provide checklists, escalation protocols and information to property management staff, or tracking performance indicators and key metrics on human trafficking prevention.

xi.   For years, Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its budget hotels, such as the TownePlace Suites®, across the country. This entrenched apathy to the real risk of sex

31

trafficking and pervasive willful blindness to the role Marriott hotels play in sex trafficking facilitated the sex trafficking of Plaintiff K.B. at TownePlace Suites® hotels that forms the basis for this complaint.

1.   In November 2017, three (3) women were rescued by police at a TownePlace Suites® in Springfield, Virginia after calling the National Human Trafficking Hotline. Their trafficker was found on the grounds of the TownePlace Suites® and placed under arrest.[57]

2.   In September of 2017, a man was arrested for trafficking women who suffer from addiction by paying them in drugs. One victim was trafficked through a TownePlace Suites® in Horsham, Pennsylvania and forced make up to $1,200 a day.[58]

### D.   THE SEX TRAFFICKING OF K.B.

55.     The facts alleged herein stem from a sex trafficking ring in New Hampshire.  While victimized by her traffickers in native New Hampshire, K.B. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotels.

56.     K.B., who was legally declared a vulnerable adult in the states of New Hampshire due to developmental disabilities, was first trafficked for the purpose of commercial sex in 2016 at the age of 26 years old.  K.B.'s first trafficker was a man who she genuinely believed to be her boyfriend. However, he knew that she had also been sexually abused as a child and used her vulnerability and desire for a loving relationship to manipulate her. Preying on her need for his affections, K.B.'s trafficker made sure that she actually believed that they were in a romantic relationship as he pushed her into commercial sex.  K.B. was

---

[57] Justin Jouvenal, *Sex trafficking charges levied after women found held against their will in Va. Hotel*, WASHINGTON POST (Nov. 2, 2017), https://www.washingtonpost.com/local/public-safety/sex-trafficking-charges-levied-after-women-found-held-against-their-will-in-va-hotel/2017/11/02/d4563b02-bfda-11e7-959c-fe2b598d8c00_story.html?utm_term=.711136f21f6c
[58] Justin Heinze, *Man Behind Human Trafficking Ring In Montgomery County Sentenced*, PATCH (Sept. 26, 2017, 7:59 PM), https://patch.com/pennsylvania/lansdale/man-behind-human-trafficking-ring-montgomery-county-sentenced

forced by her trafficker to sexually service paying strangers but he would placate her by buying her clothing, complimenting her, and giving her small gifts as he apologized for his physical assaults and torture.  K.B.'s trafficker threatened that if she rebelled against his demands, "he would take away the love that they had." K.B.'s trafficker gave her to two (2) other traffickers who bought, sold, and required her to sexually service paying strangers as she again endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at the Defendants' hotels as the Defendants profited.

57.   K.B. was required by her traffickers to have sex for payment with various buyers at the Defendants' hotels in response to advertisements for commercial sex that her traffickers posted on Backpage.com.[59] K.B. was required to service buyers through both in-calls where her trafficker would rent a room for days at a time and the buyers would come to her and out-calls where the buyer would rent a room and K.B.'s trafficker would deliver her to the buyer.

58.    K.B.'s traffickers controlled her through psychological manipulation and by punishing her with physical violence every time she did not conform to their demands.

59.   K.B. often met buyers at the Holiday Inn® Concord Downtown located at 172 North Main Street in Concord, the Best Western® Concord Inn & Suites located at 97 Hall Street in Concord, the Best Western Plus® Keene Hotel located at 401 Winchester Street in Keene, and the TownePlace Suites® Laconia-Gilford located at 14 Sawmill Road in Gilford, New Hampshire between the years 2016 and 2018.

60.   Over and over again for years, K.B. was escorted to the hotel by her trafficker who either took her straight up to a room while they were nonpaying guests or went up to the front desk with her. K.B. was prohibited from speaking to anyone or trying to communicate with them in anyway. As a result, she stood off to the side and looked down out of fear. Her trafficker would provide the front desk with only a room number as he never had the buyer's name.

---

[59] Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. See STAFF OF PERMANENT SUBCOMMITTEE ON INVESTIGATIONS; 118TH CONG., REP. ON BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING (Comm. Print 2017).

61.   All the times K.B. encountered the front desk staff and entered the Defendants' hotels she was inappropriately dressed for the weather, exhibited poor hygiene as she had very limited clothing and was prohibited from showering as a form of torture and manipulation, and was frequently being yelled at and bossed around by her trafficker. K.B. also did not have any form of identification.

62.   K.B. constantly exhibited obvious and prominent bruising all over her often exposed arms and neck as well as visible human bite marks on her neck, all inflicted by her traffickers who took care to avoid her face.

63.   K.B. and her trafficker would only be upstairs for less than an hour. K.B.'s trafficker would undress her and stand outside with her clothing while she serviced the buyer so that she could not escape.

64.   Often K.B. would exit the hotel in view of the front desk crying while her trafficker yelled at her.

65.   K.B. was forced to perform commercial sex acts on average between 6-10 men each day, sometimes even more and repeatedly visited the Defendants' hotels.

66.   K.B.'s second trafficker kept her at the Super 8® Tilton/Lake Winnipesaukee located at 7 Tilton Road in Tilton for an extended period of time. K.B.'s trafficker paid for the room in cash.

67.   K.B. was prohibited by her trafficker from leaving the room and was forced to perform commercial sex acts on average between 6-10 men each day, sometimes even more and each entered and exited the hotel and K.B.'s room, the foot traffic was voluminous and constant.

68.   At the Super 8® Tilton/Lake Winnipesaukee located at 7 Tilton Road in Tilton K.B. trafficker was so violent with her that he smashed her head into the door of the room in such a way that it broke and had her blood on it.

69.   Prior to, during, and following the incidents described herein, the Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. The Defendants failed to take any actions to curtail these activities.

70.   Had the Defendants been paying attention to the activities being conducted at their hotels and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to

34

notice the victimization of K.B.

### E.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF K.B.

71.     The Defendants profited from the sex trafficking of K.B. and knowingly or negligently aided and engaged with her traffickers in their sex trafficking venture. The Defendants leased rooms to K.B.'s traffickers, when they knew, or should have known, that they were using their room to imprison K.B., physically assault her, and subject her to repeated exploitation in sexual servitude.

72.     The Defendants knew, or should have known, that K.B. was being trafficked at their hotels and they were knowingly benefiting financially from her exploitation, because K.B.'s traffickers (including her buyers) frequented the Defendants' hotels.

73.     The Defendants knew, or should have known, that K.B. was being trafficked because of the constant noticeable and abnormal foot traffic required to appease her traffickers' demands, whether it was K.B. being brought to buyers or buyers coming to her and the other behavior that indicated the Defendants' hotels were being used for an illegal sex trafficking venture.

74.     The Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging to K.B.'s traffickers and buyers in which to harbor K.B. while they were trafficking her.

75.     The Defendants profited from the sex trafficking of K.B. and knowingly or negligently aided and participated with K.B.'s traffickers in their criminal venture. The Defendants took no action as K.B. repeatedly checked into the hotel or checked in for long periods of time without any luggage, often with different varied visitors who were all male, constantly avoiding all eye contact, and under the obvious control of one of her traffickers who treated her as a child and prohibited her from speaking and booked the rooms for her in cash or escorted her to a room for a short visit.

76.     The Defendants further actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from K.B. in which to harbor K.B. while she was being trafficked.

77.     The Defendants all had the opportunity to stop K.B.'s trafficker and offenders like him from victimizing K.B. and others like her.  Instead, every Defendant failed to take reasonable measures to stop

sex trafficking from occurring in their hotels.

78.    The Defendants all financially benefited from the sex trafficking of K.B., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

79.    The Defendants all enjoy the steady stream of income that sex traffickers bring to their budget level hotel brands.

80.    The Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

81.    The Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

82.    The Defendants maintained their deficiencies to maximize profits by:

    a.    Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b.    Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.    Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

83.    As a direct and proximate result of these egregious practices on the part of the Defendants, K.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### COUNT I – 18 U.S.C §1595 ("TVPRA")

84.    The Plaintiff K.B. incorporates each foregoing allegation.

85.    K.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

86.    All of the Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing K.B. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

87.    All of the Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefitted from the trafficking of K.B. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of K.B.'s injuries and damages.

88.    K.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591 (a).

### COUNT II – NEGLIGENCE

89.    The Plaintiff K.B. incorporates each foregoing allegation.

90.    The Defendants, and their actual and/or apparent agents, servants and/or employees, owed to K.B. a duty to use reasonable and ordinary care to provide for safety in light of the peculiar risk of sex trafficking at hotels, and to protect K.B. from injury caused by an unreasonable risk of danger in their hotel and/or on their property.

91.   Upon information and belief, prior to and during the incidents alleged herein, as outlined above, the Defendants had actual and/or constructive notice of a dangerous condition in their hotels and on their properties, including but not limited to human trafficking.

92.   In addition to the Defendants' actual and /or constructive notice, the Defendants' negligent acts, omissions, and/or commissions created a dangerous condition at their hotel and on their property, to wit, a hotel and property with inadequate security that fostered an environment which encouraged human trafficking and sexual exploitation.

93.   In addition to the Defendants' actual and /or constructive notice, the Defendants' negligent acts, omissions, and/or commissions failed to address the peculiar risk of sex trafficking in hotels, to wit, a hotel environment which encouraged human trafficking and sexual exploitation.

94.   The Defendants breached this duty of care by acts, omissions, and commissions including, but not limited to:

   a.   Failure to properly monitor surveillance cameras in the hotel and/or on the property for criminal activity and/or signs of human trafficking and/or sexual exploitation in the hotel and/or on the property;

   b.   Failure to properly monitor the number of guests in the rooms of the hotel and/or on the property;

   c.   Failure to provide adequate security in the hotel and/or on the property with the knowledge that said premises had a history of criminal activity;

   d.   Failure to properly monitor the hotel and/or property for signs of dangerous conditions, including, but not limited to, human trafficking, false imprisonment, rape, kidnapping, and sexual exploitation, by ignoring the following conditions:

      i.   The repeated refusal of maid service;

      ii.   The repeated, almost exclusive, use of side or rear exits for ingress and egress.

      iii.   The number and frequency of visitors entering and exiting the Hotel and/or

property;

    iv.   The number of guests present in any particular room as compared to the rooms capacity;

    v.   Signs of the repeated verbal abuse, physical abuse, restraint and/or confinement of an individual by another;

    vi.   Signs of control over an individual and/or an individual's personal property by another, including, but not limited to, identification documents;

    vii.   Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire;

    viii.   The repeated renting of specific rooms in their hotels.

e.   Failure to properly monitor and investigate the hotel and property for signs of suspicious behavior on the premises. Behavior, which would have alerted the Defendants to the sex trafficking of K.B or at least other criminal activity to which the Plaintiff was a victim. Behavior including, but not limited to, sounds of distress coming from rooms and areas in the hotel, non-guests entering and exiting rooms in the hotel, the repeated renting of specific rooms in the hotel, and the apparent purchasing of sex acts in the hotel.

f.   Failure to properly advise law enforcement of suspicious behavior on the premises which would have alerted the Defendants to the sex trafficking of K.B. or the other criminal activity to which she was a victim. Behavior, including, but not limited to sounds of distress coming from rooms and areas in the hotel, non-guests entering and exiting rooms in the hotel and/or property, the repeated renting of specific rooms in the hotel, and the apparent purchasing of sex acts in the hotel.

g.   Failure to adequately respond to, and investigate, guest complaints regarding suspicious behavior at the hotel and/or on the property, which would have resulted in the discovery of  the sex trafficking of K.B. or the other criminal activity to which she was a victim;

    h.   Failure to adequately respond to and investigate each of the above articulated issues, which would have stopped the ongoing victimization K.B.; and

    i.   Being otherwise careless and negligent.

95.   As a direct and proximate result of the aforementioned negligent acts, omissions, and/or commissions by the Defendants, K.B. was kidnapped, repeatedly and consistently assaulted both physically and sexually, verbally abused, held against her will, regularly exploited, and was otherwise irreparably injured, both physically and psychologically. Said acts were repeatedly perpetrated at the Defendants' hotels and the Defendants had actual or constructive knowledge that these acts, as well as other similar criminal acts, were taking place, and that a peculiar risk resided in their enterprise, and the Defendants had sufficient time to address it and were in the best position to do so. The imminent harm described above, as well as K.B.'s injuries, were a foreseeable and preventable result of the Defendants' negligence.

96.   K.B. has suffered, and/or will continue to suffer, from injuries, including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss, past, present and future, as a direct and proximate result of the Defendants', and/or their actual and/or apparent agents, servants, and/or employees', negligent acts, omissions, and/or commissions. By ignoring indicia of criminal activity, the Defendants facilitated such an environment of disorder and violence that the injuries sustained by K.B. were both foreseeable and imminent.

97. Additionally, K.B. has suffered, and continues to suffer, from damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and/or medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendants', and/or their actual and/or apparent agents, servants, and/or employees', negligent acts, omissions, and/or commissions.

98. Furthermore, K.B. has suffered, and continues to suffer, from injuries, including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life

expectations.

99. The Plaintiff avers that all damages, past, present, and future, were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendants and/or their actual and/or apparent agents, servants, and/or employees', without any negligence or want of due care on the part of the plaintiff contributing thereto.

## COUNT III– Negligent Supervision and Training

100. The Plaintiff K.B. incorporates each foregoing allegations.

101. The Defendants had a duty to use reasonable care to select, train, supervise, and retain its employees working at its hotels, including but not limited to, proper training and or supervision relating to the observation, investigation, and reporting of signs of human trafficking and sexual exploitation in or about hotels.

102. At the time of the incidents alleged herein, the Defendants employed staff to operate their hotels and properties, including, but not limited to, front desk clerks, night auditors, housekeeping staff, and/or maintenance workers. Throughout this time period, as outlined above, the Defendants and/or their actual and/or apparent agents, servants, and/or employees', repeatedly failed to observe and report signs of human trafficking and or sexual exploitation taking place at the Defendants' hotels. Furthermore, upon information and belief, the Defendants, and/or their actual and/or apparent agents, servants, and/or employees', repeatedly failed to address this peculiar risk at all.

103. Additionally, prior to the incidents alleged herein, the Defendants failed to properly train their employees regarding security and the detection of criminal activity in their hotels and on their properties, including, but not limited to, signs of human trafficking and sexual exploitation.

104. The Defendants breached this duty of care by acts, omissions, and commissions including, but not limited to:

   j. Failure to adequately train, supervise, and retain employees to ensure proper monitoring of surveillance cameras at their hotels and properties for signs of human trafficking

and/or sexual exploitation.

k.  Failure to adequately train, supervise, and retain employees to ensure proper monitoring of the number of guests in each room of their hotels, and non-guest visitors in their hotels.

l.  Failure to provide and/or train adequate security in their hotels with the knowledge that said premises had a history of criminal activity;

m.  Failure to adequately train, supervise, and retain employees, to ensure proper monitoring of their hotels for signs of dangerous conditions including, but not limited to, human trafficking, sexual exploitation, rape, and kidnapping, by ignoring the following conditions:

    i.   The repeated refusal of maid service;

    ii.  The repeated, almost exclusive, use of side or rear exits for ingress and egress.

    iii. The number and frequency of visitors entering and exiting the hotel and/or property;

    iv.  Guests present in any particular room in excess of the rooms capacity;

    v.   Signs of the repeated verbal abuse, physical abuse, restraint and/or confinement of an individual by another;

    vi.  Signs of control over an individual and/or an individual's personal property by another, including, but not limited to, identification documents;

    vii. Signs of deprivation including, but not limited to, diminished personal hygiene, lack of luggage, malnourishment, submissiveness, and inappropriate attire; and

    viii. The repeated renting of specific rooms in the hotel and/or presence on the property.

n.  Failure to adequately train, supervise, and retain employees, to ensure proper monitoring of their hotels for signs of suspicious behavior on the premises, which would have

alerted the Defendants to the sex trafficking of K.B., or other criminal activity to which she was a victim, including, but not limited to sounds of distress coming from rooms and areas in the hotel and/or on the property, non-guests entering and exiting rooms in the hotel and/or on the property, the repeated renting of specific rooms in the hotel and/or presence on the property, and the apparent purchasing of sex acts in the hotel and/or on the property;

o.  Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure the investigation of suspicious behavior at their hotel and/or properties which would have alerted the Defendants to the sex trafficking of K.B. and/or other criminal activity to which she was a victim;

p.  Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants and/or employees, including, but not limited to, training to ensure proper reporting to law enforcement of signs of criminal activity at their hotels and/or on their properties, including, but not limited to human trafficking and sexual exploitation;

q.  Failure to adequately train, supervise, and retain its actual and/or apparent agents, servants, contractors and/or employees, including, but not limited to, training to ensure a timely response and investigation into guest complaints regarding suspicious behavior at their hotels and/or on their properties, which would have resulted in their discovery of the sex trafficking of K.B. and/or other criminal activity to which she was a victim; and

r.  Being otherwise careless and negligent.

105.  As a direct and proximate result of the aforementioned negligent acts, omissions, and/or commissions by the Defendants, K.B. was kidnapped, repeatedly and consistently assaulted both physically and sexually, verbally abused, held against her will, regularly exploited, and was otherwise irreparably injured, both physically and psychologically. Said acts were repeatedly perpetrated at the

Defendants' hotels and properties and the Defendants failed to prevent against such criminal activity. The imminent harm described above, as well as K.B.'s injuries, were a foreseeable and preventable result of the Defendants' negligence and their failure to adequately train and supervise their servants, contractors, employees and/or agents.

106. K.B. has suffered, and/or will continue to suffer, from injuries, including, but not limited to, past and future conscious physical pain and mental anguish, past and future pain and suffering, and economic loss, past, present and future, as a direct and proximate result of the Defendants' failure to adequately train, supervise, and retain their employees to adequately recognize and investigate indicia of criminal activity. The Defendants' failure to adequately train, supervise, and retain their employees, agents, and/or contractors facilitated such an environment of disorder and violence that the injuries sustained by K.B. were both foreseeable and imminent.

107. Additionally, K.B. has suffered, and continues to suffer, from damages, including but not limited to, a lifetime loss of earnings, a diminution in earning capacity and/or medical expenses past and future, including the expenses that in reasonable probability will be incurred in the future, as a direct and proximate cause of the Defendants', and/or their actual and/or apparent agents, servants, contractors and/or employees', negligent acts, omissions, and/or commissions.

108. Furthermore, K.B. has suffered, and continues to suffer, from injuries, including, but not limited to, a loss of expected enjoyment of life and a permanent alteration of reasonable pre-injury life expectations.

109. The Plaintiff avers that all damages, past, present, and future, were a direct and proximate result of the negligent acts, omissions, and/or commissions of the Defendants and/or their actual and/or apparent agents, servants, contractors and/or employees', without any negligence or want of due care on the part of the Plaintiff contributing thereto.

## COUNT IV – Unjust Enrichment

110.    The Plaintiff K.B. incorporates each foregoing allegations.

111.    As a result of the trafficking and sexual exploitation of K.B., the Defendants unjustly financially

benefitted, and enriched themselves at K.B.'s expense by their acts, omissions, and commissions

including, but not limited to:

a.    Profit from renting rooms to those looking to sexually exploit K.B.

b.    Increased profit margins due to lower operation costs by refusing to implement proper

training of Defendants' employees and managers regarding the identification of human

trafficking and sexual exploitation;

c.    Increased profit margins due to lower operation costs by refusing to install proper

security devices in the lobby, hallways, and parking lots of the Defendants' hotels and

properties that would help (a) deter human trafficking and sexual exploitation and (b) be

used to identify the occurrence of human trafficking and sexual exploitation and alert the

proper authorities and/or intervene in an appropriate way;

d.    Increased profit margins due to lower operation costs by refusing to install adequate

lighting and security cameras to monitor ingress and egress of human traffickers and

visitors looking to purchase sex at the Defendants' hotels and properties.

e.    Increased profit margins due to lower operation costs by refusing to hire qualified

security officers who would actively combat human trafficking and sexual exploitation.

f.    Increased profit margins due to lower operation costs by refusing to implement proper

security measures to prevent and identify human trafficking and sexual exploitation at

the Defendants' hotels and property.

g.    Increased profit margins as a result of the continued customer loyalty of traffickers and

buyers of commercial sex who sought to exploit individuals, like K.B., due to the

Defendants' lack of measures against sexual exploitation and human trafficking. This

customer loyalty lead to continued alcohol, food, and room sales.

h.   Benefit of avoiding interference by law enforcement officials and spending the time to address and properly solve any incidence or pattern of human trafficking or sexual exploitation at the Defendants' hotel or property. This prevented the Defendants from having to spend the time and money to fill out all proper and necessary law enforcement reports and information, respond to proper and necessary subpoena requests, and cooperate with any inquiry and needs of the prosecution.

i.   Increased profit margins by knowingly catering to the needs of a criminal subculture that is looking for locations that will not actively enforce laws against human trafficking and sexual exploitation or take active security measures to prevent human trafficking or sexual exploitation on their property.

112.   These benefits were conferred onto the Defendants with their knowledge of the trafficking and/or sexual exploitation of K.B. and others like her. The Defendants accepted and retained these benefits under circumstances that make it inequitable for them to retain them without paying their value.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrongs and injuries to the Plaintiff due to the Defendants' faulty conduct, including but not limited to:

a.  All available compensatory damages for the described losses with respect to each cause of action;

b.  past and future medical expenses, as well as the costs associated with past and future life care;

c.  past and future lost wages and loss of earning capacity;

d.  past and future emotional distress;

46

e. consequential and/or special damages;

f. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g. punitive damages with respect to each cause of action;

h. reasonable and recoverable attorneys' fees;

i. costs of this action; and

j. pre-judgment and all other interest recoverable


Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted
K.B.

By her Attorneys,
**COUGHLIN, RAINBOTH, MURPHY & LOWN**


Dated: December 9, 2019

By:  /s/ Michael P. Rainboth_____
Michael P. Rainboth, Esquire, Bar No.5586
439 Middle Street
Portsmouth, NH 03801
(603) 431-1993

By:  /s/ Leif A. Becker_____
Leif A. Becker, Esquire, Bar No. 270867
439 Middle Street
Portsmouth, NH 03801
(603) 431-1993